UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CARLOS SANCHEZ,                                   12-CV-141-LJV-MJR
                                                  REPORT AND RECOMMENDATION
                        Plaintiff,

        -v-

DOCS MEDICAL DEPARTMENT,
KATHLEEN MURRAY, and
DR. BRASELMAN, MD, Elmira
 Correctional Facility,

                        Defendants.
_____

        This case has been referred to the undersigned for all pre-trial matters, including

preparation of a report and recommendation on dispositive motions.  (Dkt. No. 54).

Before the Court are motions for summary judgment by defendants DOCS Medical

Department and Peter Braselman (Dkt. No. 39) and Kathleen Murray (Dkt. No. 62).  For

the following reasons, it is recommended that both motions be granted.

## BACKGROUND

        *Pro se* plaintiff Carlos Sanchez, an inmate at the Coxsackie Correctional Facility,

commenced this 42 U.S.C. §1983 action against Dr. Peter Braselman, Registered

Nurse Kathleen Murray, and DOCS [now known as the Department of Corrections and

Community Supervision ("DOCCS")] Medical Department in 2012.  Sanchez alleges that

defendants wrongfully discontinued or threatened to discontinue his pain medication

while he was incarcerated at Elmira Correctional Facility.  (Dkt. No. 1).

        DOCCS transferred Sanchez from Great Meadow Correctional Facility to Elmira

in November 2010.  (Dkt. No. 41 ¶6).  Prior to his transfer, in 2008, Sanchez had

surgery to place hardware in his left elbow. (*Id.* ¶3). The hardware was removed in 2009. (*Id.*). Also in 2008, Sanchez had surgery on his right hand to repair an old navicular bone fracture, with pinning and bone graft. (*Id.* ¶4). Sanchez was prescribed pain medication at Great Meadow (*id.* ¶¶5-6), and he received the pain medication Neurontin during his time at Elmira. The evidence submitted by defendants in support of summary judgment — in particular, Sanchez's Ambulatory Health Record (Dkt. No. 41-1)[1] and the Declarations of Braselman (Dkt. No. 41) and Murray (Dkt. No. 65) — demonstrates that Sanchez attempted to "divert" his Neurontin on multiple occasions.[2]

On April 5, 2011, a nurse administered crushed Neurontin to Sanchez at the medication window. The nurse asked Sanchez to open his mouth, only to find the Neurontin underneath his tongue. The nurse advised Sanchez that his medication could be discontinued if he refused to take it in front of her. Sanchez told the nurse that he understood, and he swallowed the medication. (Dkt. No. 40 ¶7; Dkt. No. 41-1 at 36). On April 6 and 7, Sanchez again attempted to divert his Neurontin at the medication window. As a result, the nurse referred Sanchez's chart to his medical provider to evaluate his continued need for the medication. (Dkt. No. 41 ¶¶8-9; Dkt. No. 41-1 at 35).

On April 8, 2011, Dr. Dinello evaluated Sanchez regarding his compliance with his medication. Dinello discontinued Sanchez's morning dose of Neurontin, continued him on an evening dose, but warned that the evening dose would be discontinued if he

---

[1]    Page number citations for Sanchez's Ambulatory Health Record refer to the page number(s) assigned by CM/ECF.

[2]    In 2009, Sanchez commenced a separate action in this Court alleging that the respective medical staffs at Great Meadow and Attica Correctional Facility wrongfully denied him pain medication. On February 17, 2012, the Court (Hon. H. Kenneth Schroeder, Jr.) granted summary judgment dismissing Sanchez's complaint, finding that his disagreement with his medical treatment was not indicative of deliberate indifference to his medical needs. *Sanchez v. Wright*, No. 09-CV-469S(Sr), 2012 WL 528578 (W.D.N.Y. Feb. 17, 2012).

failed to comply.  (Dkt. No. 41 ¶10; Dkt. No. 41-1 at 35).  Nevertheless, on the evening of April 8, Sanchez again attempted to divert his medication.  (Dkt. No. 41 ¶11; Dkt. No. 41-1 at 30).  It does not appear, however, that Dinello or any other member of the medical staff discontinued Sanchez's evening dose of Neurontin after this incident.  On April 29, 2011, Dinello noted in Sanchez's Ambulatory Health Record that Sanchez was "doing OK with Neurontin at night" and that there was "[n]o evidence of cheeking medication."  (Dkt. No. 41-1 at 29).  In May and June 2011, Sanchez filed grievances requesting medical assistance to address his pain.  (Dkt. No. 40-2 at 1, 4).

On July 3, 2011, a nurse administered Neurontin to Sanchez at the second floor infirmary.  The nurse asked Sanchez to lift his tongue, after which she discovered the medication beneath it.  The nurse referred Sanchez's chart to his provider to evaluate his continued need for the medication in light of his noncompliance.  (Dkt. No. 41 ¶12; Dkt. No. 41-1 at 24).  On July 6, Dr. Alves reviewed Sanchez's chart and discontinued his Neurontin due to his efforts to divert the medication.  (Dkt. No. 41 ¶13; Dkt. No. 41-1 at 24).  Shortly thereafter, Sanchez filed two grievances objecting to the discontinuance of his pain medication.  (Dkt. No. 40-2 at 8, 14).

On July 27, 2011, Sanchez requested that Braselman prescribe him pain medication for his chronic right wrist and left elbow pain.  Braselman explained to Sanchez that his pain medication had been discontinued because of his efforts to divert it, but Sanchez promised Braselman that "he would not give [him] no more problem, that is my word."  Braselman thus re-prescribed Sanchez crushed Neurontin once a day. (Dkt. No. 41 ¶14; Dkt. No. 41-1 at 23).  On August 22, Braselman increased the dosage to twice a day.  (Dkt. No. 41 ¶16; Dkt. No. 41-1 at 22).

On November 21, 2011, Sanchez informed a nurse that he would like to speak with Braselman about taking his evening dose of Neurontin later in the day.  The nurse contacted Braselman, who advised her that the morning dose of Neurontin should be administered at 8:30 a.m. while the evening dose could be administered at 4:30 p.m. Sanchez was advised of this conversation.  (Dkt. No. 41 ¶18; Dkt. No. 41-1 at 19).  On December 8, Braselman informed Sanchez that his medication would not always be administered to him at twelve hour intervals.   Sanchez told Braselman that he understood, and he agreed to stop complaining and grieving about the issue.  (Dkt. No. 41 ¶19; Dkt. No. 41-1 at 18).

On January 8, 2012, Murray caught Sanchez trying to hide Remeron, a mental health medication, underneath his tongue.  Sanchez told Murray that he wanted to take the medication "later."  (Dkt. No. 65 ¶4; Dkt. No. 41-1 at 16).   Murray reported this incident to the Mental Health Unit nurse.  The next day, Sanchez filed a grievance accusing Murray of threatening and harassing him.  (Dkt. No. 40-2 at 21).

On March 19, 2012, a nurse caught Sanchez attempting to divert his Neurontin in the bottom of his mug.  Sanchez was issued an Inmate Misbehavior Report, and his chart was referred to his provider.  Nurse Practitioner Jill Northrup reviewed Sanchez's chart and, based on his repeated efforts to divert his medication, discontinued his Neurontin.  (Dkt. No. 41 ¶26; Dkt. No. 41-1 at 9).  Less than one month later, on April 6, 2012, DOCCS transferred Sanchez to Wende Correctional Facility.  (Dkt. No. 41 ¶27; Dkt. No. 41 at 8).

On January 13, 2012, Sanchez commenced this action in the Northern District of New York alleging that defendants wrongfully discontinued or threatened to discontinue

his pain medication.  The Northern District transferred the action to this District, after which the Court (Hon. Frank P. Geraci, Jr.) screened Sanchez's complaint pursuant to 28 U.S.C. §§1915(e)(2)(B) and 1915A.  (Dkt. No. 28).  The Court construed Sanchez's complaint as asserting two causes of action:  (1) an Eighth Amendment deliberate indifference claim alleging that defendants withheld his pain medication; and (2) a First Amendment retaliation claim alleging that defendants withheld (or threatened to withhold) his pain medication in retaliation for his complaints and grievances against Murray.  (*Id.* at 4-5).  The Court allowed both claims to proceed to service, but with respect to DOCS Medical Department, it held that Sanchez may only seek prospective injunctive relief against that defendant.  (*Id.* at 5-6).[3]

Braselman and DOCS Medical Department were served with process, answered the complaint, and, at the conclusion of discovery, moved for summary judgment dismissing the complaint.  (Dkt. No. 39).  Murray was not served with process until nearly one year after Braselman and DOCS Medical Department filed their motion.  (Dkt. No. 56).  She then filed her own motion for summary judgment.  (Dkt. No. 62).  The Court heard oral argument on both motions on August 8, 2016.

## DISCUSSION

Summary judgment is to be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has made a properly supported showing of the absence of any genuine issue as to all material facts, "the nonmoving party must come forward with specific facts showing that there is a *genuine*

---

[3]     The Court also granted Sanchez leave to amend his complaint to add a claim against "Mrs. Putney, RN II (Nurse)," a nurse at Elmira, as well as claims against medical personnel at Wende.  (Dkt. No. 28 at 6-9).  Sanchez never filed an amended complaint.

issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citation omitted).  "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'"  *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  While "[a]ll reasonable inferences and any ambiguities are drawn in favor of the nonmoving party," *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990), to defeat summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

Where, as here, the party opposing summary judgment is proceeding *pro se*, the Court must read his opposition papers "liberally and interpret them to raise the strongest arguments that they suggest."  *Morrison v. Parmele,* 892 F. Supp. 2d 485, 487 (W.D.N.Y. 2012) (quoting *Corcoran v. N.Y. Power Auth.,* 202 F.3d 530, 536 (2d Cir. 1999)), *aff'd,* 523 F. App'x 51 (2d Cir. 2013).  "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Singh v. N.Y. State Dep't of Taxation & Fin.*, 911 F. Supp. 2d 223, 233 (W.D.N.Y. 2012) (quoting *Cole v. Artuz,* No. 93 Civ. 5981(WHP)JCF, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999)).

Under Local Rule of Civil Procedure 56, the party moving for summary judgment must submit a "separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be

tried." Local Rule 56(a)(1). The party opposing the motion must then respond to each numbered paragraph and, if necessary, provide his own statement of additional facts as to which he contends there exists a genuine issue to be tried. Local Rule 56(a)(2). "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." *Id.*

Here, although defendants filed Statements of Undisputed Facts (Dkt. No. 40 (Statement of Braselman and DOCS Medical Department); Dkt. No. 63 (Statement of Murray)), Sanchez did not file an opposing statement. Nor did Sanchez file any papers in opposition to Murray's motion. Sanchez did, however, file three documents in opposition to Braselman's and DOCS Medical Department's motion — an "Answer" (Dkt. No. 51), a "Statement and Reply" (Dkt. No. 52), and a "Reply" (Dkt. No. 53). These documents, sworn to by Sanchez, address his claims against all three defendants.[4] In light of these filings, rather than simply treat defendants' proposed facts as admitted, the Court has opted to review the record to determine whether a genuine dispute exists with respect to any material fact. *See Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) ("[The District Court] may in its discretion opt to 'conduct an assiduous review of the record' even where one of the parties has failed to file such a statement.") (quoting *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000)). Upon such review, the Court concludes that no genuine dispute exists as to any material fact and that defendants are entitled to judgment as a matter of law.

---

[4]     The Court also notes that although defendants filed separate summary judgment motions, both motions rely largely upon the same documentary evidence — namely, Sanchez's Ambulatory Health Record and his grievances and complaints concerning his medical treatment.

I.     *Claims Against Braselman and Murray*

A.  *Eighth Amendment Deliberate Indifference Claim*

"The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a duty upon prison officials to ensure that inmates receive adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 844 (1994)).  To prevail on an Eighth Amendment claim, Sanchez must establish "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  This analysis includes two components, one objective and one subjective.

Under the objective component, the alleged deprivation of medical care must be "sufficiently serious."  *Salahuddin*, 467 F.3d at 279 (internal quotation marks and citation omitted).  "Determining whether a deprivation is an objectively serious deprivation entails two inquiries."  *Id.*  "The first inquiry is whether the prisoner was actually deprived of adequate medical care," while the second inquiry "asks whether the inadequacy in medical care is sufficiently serious."  *Id.* at 279-80.  The second inquiry "requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Id.* at 280.  Factors to be considered "include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)

(alteration in original) (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992)).

Under the subjective component, the Court considers whether the defendant acted with a "sufficiently culpable state of mind," *i.e.*, deliberate indifference. *Farmer*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). "Deliberate indifference is a mental state equivalent to subjective recklessness, as that term is used in criminal law." *Salahuddin*, 467 F.3d at 280. "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'" *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). "[R]ecklessness entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." *Salahuddin*, 467 F.3d at 280.

Defendants first argue that Sanchez's deliberate indifference claim should be dismissed as against Braselman and Murray because neither defendant made the decision to discontinue Sanchez's pain medication. The Court agrees. It was Dinello who discontinued Sanchez's morning dose of Neurontin on April 8, 2011, Alves who completely discontinued it on July 6, 2011, and, after Braselman put Sanchez back on Neurontin at the end of July 2011, Northrup who discontinued it again on March 19, 2012. Moreover, with respect to Murray, it is undisputed that as a registered nurse she lacks the power to prescribe or discontinue medication. (Dkt. No. 65 ¶5). Thus,

because neither Braselman nor Murray discontinued Sanchez's pain medication, they did not act with deliberate indifference to his medical needs.

Assuming *arguendo* that Braselman and Murray somehow contributed to the medical staff's decisions to discontinue Sanchez's pain medication, these decisions were not made with deliberate indifference to Sanchez's serious medical needs.  The Ambulatory Health Record and Braselman's and Murray's Declarations show that Sanchez's Neurontin was discontinued solely because he attempted to divert his medication at Elmira no less than seven times.  Sanchez even began diverting his medication before DOCCS transferred him to Elmira — records from Great Meadow show that he engaged in similar behavior there as well.  (Dkt. No. 41 ¶5; Dkt. No. 41-1 at 55).  In light of Sanchez's efforts to misuse his medication, the medical staff's decisions to discontinue his Neurontin were reasonable and prudent.  *See Jones v. Tompkins*, No. 12-CV-57, 2016 WL 4211610, at *7 (W.D.N.Y. Aug. 10, 2016) (finding nurse's decision to report plaintiff's diversion of pain medication to doctor and doctor's subsequent decision to discontinue plaintiff's pain medication to not constitute deliberate indifference); *see also Dabney v.* Sawyer, No. 9:11-CV-0273(BKS/RFT), 2015 WL 1383828, at *11 (N.D.N.Y. Mar. 25, 2015) (dismissing deliberate indifference claim where plaintiff was found hoarding his pain medication); *Cole v. Pang Lay Kooi*, No. 9:11-CV-0004(LEK/RFT), 2013 WL 4026842, at *5 (N.D.N.Y. Aug. 6, 2013) (same). Had the medical staff not discontinued Sanchez's pain medication, he may have eventually diverted it for an improper purpose, such as abusing it at a later time or selling it to other inmates.

In opposition to this evidence, Sanchez relies upon his own conclusory statement that he never attempted to divert his pain medication.   (Dkt. No. 52 ¶4; Dkt. No. 53 ¶7). Sanchez's conclusory denials are flatly contradicted by defendants' evidence — specifically, the Declarations of Braselman and Murray and Sanchez's Ambulatory Health Record — and, therefore, are insufficient to create a material issue of fact as to why the medical staff discontinued his pain medication.   In particular, the Ambulatory Health Record is a contemporaneous account of Sanchez's efforts to divert his pain medication.   Contrary to Sanchez's argument (*see* Dkt. No. 53 ¶7), multiple members of the medical staff, not just Murray, made entries in his Ambulatory Health Record regarding his efforts to divert his medication.   Sanchez has not set forth any evidence for the Court to reasonably infer that the Elmira medical staff somehow conspired to falsify all seven entries regarding the diversion of his medication.   Simply put, no rational trier of fact could credit Sanchez's conclusory denial that he did not attempt to divert his medication.   *See Nelson v. Deming*, 140 F. Supp. 3d 248, 260 (W.D.N.Y. 2015) ("The medical records and affidavits submitted by Defendants demonstrate that Plaintiff . . . received adequate medical care.   Accordingly, Plaintiff's conclusory assertions to the contrary are insufficient to create a material issue of fact."); *Murray v. Nephew*, No. 9:13-CV-1056(FJS/ATB), 2015 WL 1730178, at *7 (N.D.N.Y. Apr. 14, 2015) (same); *Brown v. White*, No. 9:08-cv-200(GLS/ATB), 2010 WL 985184, at *9 (N.D.N.Y. Mar. 15, 2010) ("Plaintiff's conclusory and inconsistent allegations that he was effectively deterred by conduct of the defendant from seeking all medical attention from October 11, 2007 until January 15, 2008 is insufficient to create a disputed issue of fact in light of the contrary facts stated in the defendant's sworn declarations and

supporting documents."). Therefore, Sanchez's conclusory denial does not raise a genuine issue of material fact as to why the medical staff discontinued his Neurontin.

Sanchez also argues that the absence of a misbehavior report demonstrates that he never attempted to divert his Neurontin. Sanchez overlooks, however, that Elmira did in fact issue him a misbehavior report for diverting his medication on March 19, 2012. (Dkt. No. 41 ¶26; Dkt. No. 41-1 at 9). Sanchez also appears to argue that Murray violated his constitutional rights when she crushed his Neurontin in the absence of a "crush order" from Braselman. Even putting aside the fact that Sanchez has not explained why administering crushed medication constitutes deliberate indifference under the Eighth Amendment, the evidence shows that Braselman did in fact direct Sanchez's Neurontin to be crushed, presumably to limit his ability to divert the drug. (Dkt. No. 41 ¶14; Dkt. No. 41-1 at 23). For all of these reasons, neither Braselman nor Murray acted with deliberate indifference to Sanchez's serious medical needs. It is recommended that Sanchez's first claim be dismissed as against these two defendants.

B. *First Amendment Retaliation Claim*

Because prisoner retaliation claims are easily fabricated and may intrude into matters of prison administration, the Court must approach Sanchez's retaliation claim "with skepticism and particular care." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). To establish his retaliation claim, Sanchez must show: (1) that he engaged in protected speech or conduct; (2) that defendants took an adverse action against him; and (3) a causal connection between his protected activity and the adverse action. *Id.* at 492.

Sanchez alleges that he engaged in protected activity by filing complaints against Murray, and that defendants retaliated against him by discontinuing (or threatening to discontinue) his pain medication.  The evidence shows, however, that Sanchez did not complain about Murray until *after* the medical staff had already discontinued his pain medication multiple times.  Specifically, the Elmira medical staff discontinued Sanchez's morning dose of Neurontin in April 2011 before completing discontinuing it in July 2011. Murray did not report Sanchez for diverting his medication until January 8, 2012, and she did so because Sanchez again attempted to divert his medication, which could have affected his "care and treatment plan."  (Dkt. No. 65 ¶¶4-5).[5]  It was not until after these events took place — on January 9 — that Sanchez filed his harassment grievance against Murray.  Based on this timeline, Sanchez's complaint against Murray could not have caused the adverse action he complains of.  *See McAllister v. Queens Borough Pub. Library*, 309 F. App'x 457, 459 (2d Cir. 2009) (summary order) (dismissing retaliation claim where adverse action preceded protected activity); *Wilcox v. Cornell Univ.*, 986 F. Supp. 2d 281, 288 (S.D.N.Y. 2013) (same).

In his grievance, Sanchez also contends that on January 6, 2012, he received a letter granting his request to add Murray as a defendant in his prior action against Attica and Great Meadow medical staff members, Case Number 09-cv-469.  (Dkt. No. 40-2 at 21).  However, the docket sheet from that action does not list Murray as a defendant, and there is no evidence that Murray was even aware of the lawsuit.  Thus, Murray could not have retaliated against Sanchez on account of this prior lawsuit.  *See Encarnacion v. Silverberg*, No. 9:13-CV-1000(TJM)(RFT), 2015 WL 5604769, at *6

---

[5]     Sanchez argues that on November 21, 2011, he wrote a letter to Elmira Superintendent Chappius regarding problems he had with Murray.  (Dkt. No. 52 ¶5).  Contrary to Sanchez's argument, this letter does not identify Murray.  (Dkt. No. 40-1 at 17).

(N.D.N.Y. Sept. 23, 2015) (dismissing claim alleging that nurse and doctor terminated plaintiff's pain medication in retaliation for plaintiff's complaint because the nurse and doctor were not named in the complaint and had no knowledge of it).  As discussed in connection with Sanchez's deliberate indifference claim, the Elmira medical staff discontinued Sanchez's Neurontin not because of his complaints, but because he repeatedly attempted to divert his medication.  Accordingly, it is recommended that Sanchez's retaliation claim be dismissed as against Braselman and Murray.

II.    *Claims Against DOCS Medical Department*

DOCS Medical Department argues that Sanchez's claims against it should be dismissed as moot because Sanchez is no longer incarcerated at Elmira.  An inmate's transfer to a new correctional facility generally moots his request for injunctive relief. *See Salahuddin*, 467 F.3d at 272.  Here, Sanchez's claims and his request for injunctive relief against DOCS Medical Department arise from his purported mistreatment by the Elmira medical staff at that facility.[6]  There is no evidence to suggest that Sanchez is receiving inadequate medical treatment at Coxsackie Correctional Facility, where he is currently housed.  Accordingly, it is recommended that Sanchez's claims against DOCS Medical Department be dismissed.

III.    *Exhaustion*

Sanchez's claims may also be dismissed because he failed to exhaust his administrative remedies.  Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. §1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative

---

[6]      Sanchez seeks the following relief:  "I need they stop the Harassment, Abuse and discrimination also I'm real request the appropriate Medical Assistance and appropriate respect from Medical Staff. Also I suing for $1,000,000.00 dollars [sic]."  (Dkt. No. 1 at 7).

remedies as are available are exhausted."   42 U.S.C. §1997e(a).   "In New York, a prison inmate's administrative remedies consist of a three-step grievance and appeal procedure:   (1) investigation and review of the grievance by the Inmate Grievance Resolution Committee ("IGRC"), which is comprised of inmates and DOCCS employees; (2) if appealed, review of the IGRC's determination by the superintendent of the facility; and (3) if the superintendent's decision is appealed, review and final administrative determination by the Central Office Review Committee ("CORC")." *Robinson v. Viscuso*, No. 10-CV-326, 2013 WL 5470013, at \*12 (W.D.N.Y. Sept. 30, 2013) (citing 7 N.Y.C.R.R. §701.5).   "In general, it is only upon completion of all three levels of review that a prisoner may seek relief in federal court under §1983."   *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010).

Harassment grievances, *i.e.*, "grievances that allege employee misconduct meant to annoy, intimidate or harm an inmate," 7 N.Y.C.R.R. §701.2(e), are governed by an "expedited" review process.   *See id.* §701.8.   "When the grievance clerk identifies a harassment grievance, the clerk must forward the grievance to the superintendent on the same day that the grievance was filed.   If the grievance presents a bona fide harassment issue, then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance."   *Williams v. Priatno*, --- F.3d ----, 2016 WL 3729383, at \*1 (2d Cir. July 12, 2016) (internal citations omitted).   The inmate may then appeal the superintendent's response to the CORC.   7 N.Y.C.R.R. §701.8(h).   If the grievance does not present a bona fide harassment issue, it is returned to the IGRC for normal processing.   *Id.* §701.8(c).   Importantly, "[r]egardless of whether a given grievance is

governed by §701.8's procedure for harassment claims . . . or the more general framework found in §701.5, the grievant must appeal to the CORC before his claims are fully exhausted." *Armand v. Simonson*, No. 12-CV-7709(KMK), 2016 WL 1257972, at *17 (S.D.N.Y. Mar. 30, 2016).

When Sanchez was incarcerated at Elmira, he filed five grievances relating to pain medication. (Dkt. No. 40-1 at 22). Sanchez states that all five grievances were "denied." (Dkt. No. 53 ¶8). However, the uncontroverted evidence shows that he never appealed any of his Elmira grievances to the CORC. (Dkt. No. 40-3 at 1). No evidence suggests that the appeal process was unavailable to Sanchez. Thus, it is undisputed that Sanchez failed to completely exhaust his administrative remedies, and it is recommended that all three defendants be granted summary judgment on this basis as well. *Robinson*, 2013 WL 5470013, at *12 (granting summary judgment dismissing Eighth Amendment claim because plaintiff failed to appeal grievance to the CORC).

## CONCLUSION

For the foregoing reasons, it is recommended that the motions for summary judgment by DOCS Medical Department and Peter Braselman (Dkt. No. 39) and Kathleen Murray (Dkt. No. 62) be granted.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Vilardo, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b),

6(a), and 6(d) of the Federal Rules of Civil Procedure, and Local Rule of Civil Procedure 72.  Any requests for an extension of this deadline must be made to Judge Vilardo.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.***  *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Civil Procedure 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority."  ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

SO ORDERED.

Dated:        August 16, 2016
              Buffalo, New York

                                    */s/ Michael J. Roemer*
                                    MICHAEL J. ROEMER
                                    United States Magistrate Judge